CONNECTICUT GENERAL INSUR-
ANCE CORPORATION et al.,
Plaintiffs,

v.

UNITED STATES RAILWAY ASSO-
CIATION et al., Defendants,

George P. Baker et al., Intervening-
Defendants.

Richard Joyce SMITH, Trustee of The
New York, New Haven and Hartford
Railroad Company, Plaintiffs,

v.

UNITED STATES of America et al.,
Defendants,

George P. Baker et al., Intervening-
Defendants.

PENN CENTRAL COMPANY, Plaintiff,

v.

Claude S. BRINEGAR, as Secretary of
Transportation of the United States,
et al., Defendants,

George P. Baker et al., Intervening-
Defendants.

Civ. A. Nos. 74–189, 74–1107 and 74–1149.

United States District Court,
E. D. Pennsylvania.

June 25, 1974.

**512**

Willkie, Farr & Gallagher by Louis A. Craco, New York City, for Connecticut General Ins. Corp.

Sullivan & Worcester by Joseph Auerbach, Morris Raker, Charles W. Morse, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford R. Co.

David Berger, P. A. by David Berger, and Gerald Jay Rodos, Philadelphia, Pa., for Penn Central Co.

James F. Dausch, and Lloyd Cutler, Washington, D. C., for defendants.

Covington & Burling by Charles A. Horsky, Brice M. Clagett, Washington, D. C., Paul R. Duke, John DePodesta, and John B. Rossi, Jr., Philadelphia, Pa., for the Trustees, Penn Central Transportation Co.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of New York.

Before ALDISERT, Circuit Judge, and FULLAM and BECHTLE, District Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

These cases present the question whether an injunction should issue restraining the enforcement of certain provisions of the Regional Rail Reorganization Act of 1973, Public Law 93–236, 45 U.S.C. §§ 743, 744, because of constitutional infirmities. Three-judge courts have been convened pursuant to 28 U.S.C. §§ 2282, 2284, and the matters are consolidated for disposition on cross-motions for summary judgment. The Connecticut General plaintiffs are owners of mortgage bonds and are corporate trustees or successor corporate trustees under indentures, mortgages and deeds of trust of the Penn Central Transportation Company and certain of its lease lines which together comprise the "Penn Central System."[1] Plaintiff, Richard Joyce Smith, Trustee of the property of The New York, New Haven and Hartford Railroad Company, Debtor, is the registered holder of divisional mortgage bonds of Penn Central Transportation Company.[2] These bonds are secured by

---

1. The following plaintiffs own the approximate principal amounts of mortgage bonds of Penn Central and of certain Lessors secured by mortgages on rail properties and other properties of Penn Central and certain Lessors set forth opposite their respective names:

    a. Connecticut General Insurance Corporation ....................................... $ 31,025,000
    b. Connecticut Mutual Life Insurance Company .............................. 9,985,000
    c. The Equitable Life Assurance Society of the United States ............................ 147,509,000
    d. Metropolitan Life Insurance Company ........................................ 69,687,000
    e. The Prudential Insurance Company of America .................................... 35,395,000

---

2. Plaintiff, Richard Joyce Smith, Trustee of the property of The New York, New Haven and Hartford Railroad Company, Debtor in reorganization under Section 77 of the

a divisional mortgage comprising a first lien attaching certain real property, railroad tracks and improvements of the Penn Central Transportation Company. Plaintiff, Penn Central Company, is the owner of 100% of the stock in and is a creditor of the Penn Central Transportation Company, Debtor.

The defendants are the United States Railway Association, a corporate entity established under Section 201 of the Act, 45 U.S.C. § 711; the Secretary of Transportation; the Chairman of the Interstate Commerce Commission; the Secretary of the Treasury; and the United States of America. Penn Central Trustees, Intervening Defendants, are presently operating the Penn Central Railroad under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205, in this court at Bankruptcy No. 70–347.

While plaintiffs challenge the constitutionality of the 1973 Act with a galaxy of arguments, their central contentions may be summarily outlined:

1. The 1973 Act ultimately requires a permanent taking of their property for which they are entitled to be paid in cash instead of stocks and other securities; that the conveyance procedures offend procedural due process; and that a deficiency judgment against Conrail provides no assurance that just compensation would be paid.

2. The 1973 Act violates the geographical uniformity requirement of Article I, Section 8, Clause 4 of the United States Constitution.

3. The 1973 Act effects an interim taking of their property by requiring continued rail operation pending implementation of the Final System Plan.

### I.

Before consideration of these contentions, a short summary of the Act is necessary. The judicial panel on multi-district litigation described it as "an heroic attempt" by Congress to solve a complex and deeply rooted problem. Eight major railroads in the Northeast and Midwest are undergoing reorganization pursuant to Section 77 of the Bankruptcy Act. Of these eight, seven are the only Class I railroads, those with $5 million or more of annual revenue, in the United States in reorganization. "Reasons cited for this [Northeast railroad] crisis were competition from 90 million automobiles and multiple schedules of competitive jet air service which directly competed with passenger transportation. The decline of railroad freight business also diminished the passenger carrying capabilities of the railroads. Traditional railroad freight business was lost to inland waterway operations, pipelines and trucks. Moreover, government policy tended 'to favor non-rail transportation and perpetuate a regulatory climate that [was] hostile to experimentation.' Water, air and highway transportation were successfully aided through public investment, at little or no user cost while railroads had to make such investments on their own." [3]

Congress first responded to the rail crisis with the Emergency Rail Services Act of 1970, 45 U.S.C. § 661 et seq., authorizing the Secretary of Transportation to guarantee up to one hundred twenty-five million dollars in certificates issued by trustees of railroads in reorganization under Section 77. However, detailed treatment of the railroads' particular difficulties did not emerge until the enactment of the 1973 Act. As stated in the defendants' brief:

> The 1973 Act represents Congress' comprehensive response to the long-range problems of railroads that own or operate most of the trackage in the Northeast and Midwest, and which

Bankruptcy Act ("New Haven Trustee" and "New Haven" respectively) is the registered holder of $34,025,800 principal amount of 5% Divisional Mortgage Bonds ("Bonds") of Penn Central Transportation Company, Debtor.

3. In re Central Railroad Company of New Jersey, 3 Cir., 485 F.2d 208, 217 (Aldisert, J., dissenting) (footnotes omitted), citing, *inter alia*, Staff Report, "The Penn Central and Other Railroads," Senate Committee on Commerce, December, 1972, at 220–222.

therefore constitute a vital segment of the U.S. railroad system and an important segment of the U.S. economy.

The Act requires the United States Railway Association . . . to design a [Final System] [P]lan for reorganized rail services in the Region . . . and provides, among other things, that a new private railroad, the Consolidated Rail Corporation ("Conrail") shall acquire, own and operate rail properties pursuant to the Final System Plan.

(Brief, 10–11.)

Congress also provided in the 1973 Act several kinds of financial assistance, new in form and substantial in amount, each intended to assist in creating and implementing the overall plan for rail transportation service in the Region and the Conrail portion of that plan in particular. Four of these additional resources deserve special mention. (i) Substantial obligational authority is conferred on USRA. To carry out its purposes under the Act (principally to plan the new rail system and to provide part of the consideration for rail properties acquired by Conrail under the Act), USRA is authorized to issue $1.5 billion in securities to be guaranteed by the Secretary of Transportation. Section 210. Of this sum, not more than $1 billion may be issued to Conrail, of which not less than half must be used by Conrail for rail rehabilitation and modernization. Section 210(b). Additional amounts may be issued if approved by joint resolution of Congress. *Ibid.* (ii) The Secretary of Transportation, with USRA's approval, is authorized to enter into agreement for the acquisition, maintenance or improvement of property that will be in the Final System Plan; for this purpose, the Act provides obligational authority of $150 million. Section 215. (iii) To meet emergency needs pending implementation of the Final System Plan, the Secretary of Transportation is further authorized to make payments not exceeding $85 million to the trustees of railroads in reorganization. Section 213. (iv) Finally, the Secretary of Transportation and the Association may provide subsidies for continuing noneconomic service and loans for the acquisition and modernization of rail properties. Sections 402 and 403.

(Brief, 12–13.)

Section 207(b)[4] of the Act sets forth the procedure by which a railroad be-

4. Sec. 207

\* \* \* \* \*

(b) *Approval.*—Within 120 days after the date of enactment of this Act each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act. Within 60 days after the submission of the report by the Office, under section 205(d)(1) of this title, on the Secretary's report on rail services in the region, each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether or not such railroad shall be reorganized by means of transferring some of its rail properties to the Corporation pursuant to the provisions of this Act. Because of the strong public interest in the continuance of rail transportation in the region pursuant to a system plan devised under the provisions of this Act, each such court shall order that the reorganization be proceeded with pursuant to this Act unless it (1) has found that the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by such a reorganization than by a reorganization under this Act, or (2) finds that this Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization in which case it shall dismiss the reorganization proceeding. If a court does not enter an order or make a finding as required by this subsection, the reorganization shall be proceeded with pursuant to this Act. An appeal from an order made under this section may be made only to the special court. Appeal to

comes subject to the transfer provisions contained in the Final System Plan. The Section 77 Penn Central reorganization court has already determined that Penn Central is not reorganizable "on an income basis within a reasonable time under section 77 of the Bankruptcy Act." The next step under the Act is the "180-day" determination by that court as to whether "such railroad shall be reorganized by means of transferring some of its rail properties to the Corporation." This hearing was held on June 10, 1974, but no findings have yet been made.

Within 420 days after January 2, 1974, a Final System Plan must be prepared by the executive committee of the Association and submitted for approval by its Board of Directors. Section 207(c). Yet final review of the Plan remains with Congress. Section 208(a). A Special Court has been created to "exercise the powers of a district judge in any judicial district with respect to such proceedings and such powers shall include those of a reorganization court. The special court shall have the power to order the conveyance of rail properties of railroads leased, operated, or controlled by a railroad in reorganization in the region." Section 209(b).[5]

The Association is required to deliver a copy of the Final System Plan to the Special Court. Section 209(c).[6] Thereafter, the Special Court shall order the trustees to convey to Conrail "forthwith . . . all right, title, and interest in the rail properties. . . ." Section 303(b).[7]

the special court shall be taken within 10 days following entry of an order pursuant to this subsection, and the special court shall complete its review and render its decision within 80 days after such appeal is taken. There shall be no review of the decision of the special court.

5. Members of the Special Court selected by the judicial panel on multi-district litigation, as provided by Section 209(b), are Circuit Judges Henry J. Friendly and Carl McGowan, and District Judge Roszel C. Thomsen.

6. Sec. 209

 \*     \*     \*     \*     \*

(c) *Delivery of Plan to Special Court.*— Within 90 days after its effective date, the Association shall deliver a certified copy of the final system plan to the special court and shall certify to the special court —

(1) which rail properties of the respective railroads in reorganization in the region and of any railroad leased, operated, or controlled by such railroads in reorganization are to be transferred to the Corporation, in accordance with the final system plan;

(2) which rail properties of the respective railroads in reorganization in the region or railroads leased, operated, or controlled by such railroads in reorganization are to be conveyed to profitable railroads, in accordance with the final system plan;

(3) the amount, terms, and value of the securities of the Corporation (including any obligations of the Association) to be exchanged for those rail properties to be transferred to the Corporation pursuant to the final system plan, and as indicated in paragraph (1) of this subsection; and

(4) that the transfer of rail properties in exchange for securities of the Corporation (including any obligations of the Association) and other benefits is fair and equitable and in the public interest.

7. Sec. 303. (a) *Deposit With Court.*—Within 10 days after delivery of a certified copy of a final system plan pursuant to section 209(c) of this Act—

(1) the Corporation, in exchange for the rail properties of the railroads in reorganization in the region and of railroads leased, operated, or controlled by railroads in reorganization in the region to be transferred to the Corporation, shall deposit with the special court all of the stock and other securities of the Corporation and obligations of the Association designated in the final system plan to be exchanged for such rail properties;

(2) each profitable railroad operating in the region purchasing rail properties from a railroad in reorganization in the region, or from a railroad leased, operated, or controlled by a railroad in reorganization in the region, as provided in the final system plan shall deposit with the special court the compensation to be paid for such rail properties.

(b) *Conveyance of Rail Properties.*—(1) The special court shall, within 10 days after deposit under subsection (a) of this section of the securities of the Corporation, obligations of the Association, and compensation from the profitable railroads operating in

the region, order the trustee or trustees of each railroad in reorganization in the region to convey forthwith to the Corporation and the respective profitable railroads operating in the region, all right, title, and interest in the rail properties of such railroad in reorganization and shall itself order the conveyance of all right, title, and interest in the rail properties of any railroad leased, operated, or controlled by such railroad in reorganization that are to be conveyed to them under the final system plan as certified to such court under section 209(d) of this Act.

(2) All rail properties conveyed to the Corporation and the respective profitable railroads operating in the region under this section shall be conveyed free and clear of any liens or encumbrances, but subject to such leases and agreements as shall have previously burdened such properties or bound the owner or operator thereof in pursuance of an arrangement with any State, or local or regional transportation authority under which financial support from such State, or local or regional transportation authority was being provided at the time of enactment of this Act for the continuance of rail passenger service or any lien or encumbrance of no greater than 5 years' duration which is necessary for the contractual performance by any person of duties related to public health or sanitation. Such conveyances shall not be restrained or enjoined by any court.

(3) Notwithstanding anything to the contrary contained in this Act, if railroad rolling stock is included in the rail properties to be conveyed, such conveyance may only be effected if the profitable railroad operating in the region or the Corporation to whom the conveyance is made assumes all of the obligations under any conditional sale agreement, equipment trust agreement, or lease in respect to such rolling stock and such conveyance is made subject thereto; and the provisions of this Act shall not affect the title and interests of any lessor, equipment trust trustee, or conditional sale vendee or assignee under such conditional sale agreement, equipment trust agreement or lease under section 77(j) of the Bankruptcy Act (11 U.S.C. 205(j)).

(4) Notwithstanding anything to the contrary contained in this Act, if a railroad in reorganization has leased rail properties from a lessor that is neither a railroad nor controlled by or affiliated with a railroad, and such lease has been approved by the lessee railroad's reorganization court prior to the date of enactment of this Act,

conveyance of such lease may only be effected if the Corporation or the profitable railroad to whom the conveyance is made assumes all of the terms and conditions specified in the lease, including the obligation to pay the specified rent to the nonrailroad lessor.

(c) *Findings and Distribution.*—(1) After the rail properties have been conveyed to the Corporation and profitable railroads operating in the region under subsection (b) of this section, the special court, giving due consideration to the findings contained in the final system plan, shall decide—

(A) whether the transfers or conveyances—

(i) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to the Corporation in exchange for the securities and the other benefits accruing to such railroad as a result of such exchange, as provided in the final system plan and this Act, and

(ii) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to a profitable railroad operating in the region, in accordance with the final system plan,

are in the public interest and are fair and equitable to the estate of each railroad in reorganization in accordance with the standard of fairness and equity applicable to the approval of a plan of reorganization or a step in such a plan under section 77 of the Bankruptcy Act (11 U.S.C. 205), or fair and equitable to a railroad that is not itself in reorganization but which is leased, operated, or controlled by a railroad in reorganization; and

(B) whether the transfer or conveyances are more fair and equitable than is required as a constitutional minimum.

(2) If the special court finds that the terms of one or more exchanges for securities and other benefits are not fair and equitable to an estate of a railroad in reorganization, or to a railroad leased, operated, or controlled by a railroad in reorganization, which has transferred rail properties pursuant to the final system plan, it shall—

(A) enter a judgment reallocating the securities of the Corporation in a fair and equitable manner if it has not been fairly allocated among the railroads transferring rail properties to the Corporation; and

(B) if the lack of fairness and equity cannot be completely cured by a reallocation of the Corporation's securities, order the Corporation to provide for the transfer to the railroad of other securities of the Corporation or obligations of the As-

After the conveyances, the Special Court reviews the terms of the exchange as set forth in the Final System Plan. In remedying any inadequacy of consideration which it finds, that court is permitted to reallocate Conrail's securities among the various bankrupt estates, to order the provision by Conrail of further securities of Conrail or obligations of the Association as designated in the Final System Plan and, ultimately, to enter a deficiency judgment against Conrail should these steps prove insuffifcient to pay the estates their "constitutional minimum."

## II.

We first dispose of plaintiffs' threshold contention that the possible future conveyance of rail properties to Conrail in consideration for Conrail stock and securities· constitutes a Fifth Amendment taking without payment of just compensation.[8] Plaintiffs argue that the provision for compensation for the conveyance of Penn Central assets renders the Act unconstitutional on its face because the compensation provided in the Act is not payable in money or other legal tender, because the purported safety valve in a deficiency judgment against Conrail provides no assurance that just compensation will be paid, and because these procedures offend procedural due process.

■■ We do not meet these Fifth Amendment questions because we are persuaded that these issues are premature. "Courts do not review issues, especially constitutional issues, until they have to." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 154–155, 71 S.Ct. 624, 639, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). It has been said that a number of jurisprudential rules underlie this general principle. The doctrines of "standing", "ripeness", "finality" and "mootness" all serve "the primary conception that federal judicial power is to be exercised to

sociation as designated in the final system plan in such nature and amount as would make the exchange or exchanges fair and equitable ; and

(C) if the lack of fairness and equity cannot be completely cured by reallocation of the Corporation's securities or by providing for the transfer of other securities of the Corporation or obligations of the Association as designated in the final system plan, enter a judgment against the Corporation.

(3) If the special court finds that the terms of one or more conveyances of rail properties to a profitable railroad operating in the region in accordance with the final system plan are not fair and equitable, it shall enter a judgment against such profitable railroad. If the special court finds that the terms of one or more conveyances or exchanges for securities or other benefits are fairer and more equitable than is required as a constitutional minimum, then it shall order the return of any excess securities, obligations, or compensation to the Corporation or a profitable railroad so as not to exceed the constitutional minimum standard of fairness and equity.

(4) Upon making the findings referred to in this subsection, the special court shall order distribution of the securities, obligations, and compensation deposited with it under subsection (b) of this section to the trustee or trustees of each railroad in reorganization in the region who conveyed right, title, and interest in rail properties to the Corporation and the respective profitable railroads under such subsection.

(d) *Appeal.*—A finding or determination entered pursuant to subsection (c) of this section may be appealed directly to the Supreme Court of the United States in the same manner that an injunction order may be appealed under section 1253 of title 28, United States Code : Provided, That such appeal is exclusive and shall be filed in the Supreme Court not more than 5 days after such finding or determination is entered by the special court. The Supreme Court shall dismiss any such appeal within 7 days after the entry of such an appeal if it determines that such an appeal would not be in the interest of an expeditious conclusion of the proceedings and shall grant the highest priority to the determination of any such appeals which it determines not to dismiss.

8. In addition to the mandatory conveyance provision of the Act, Congress provided that the conveyances be made "free and clear of any liens and encumbrances" subject to limited exceptions. Section 303(b)(2).

strike down legislation . . . only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action." Poe v. Ullman, 367 U.S. 497, 503–504, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989 (1961). We believe that the present circumstances do not present a ripe controversy because the basis of plaintiffs' complaint depends on the "concurrence of . . . contingent events . . . too speculative to warrant anticipatory judicial determinations." Eccles v. Peoples Bank, 333 U.S. 426, 432, 68 S.Ct. 641, 645, 92 L.Ed. 784 (1948).

Before the plaintiffs may be harmed by the mandatory conveyances, certain contingencies must occur. First, the Penn Central reorganization court must decide "whether or not such railroad shall be reorganized by means of transferring some of its rail properties to the Corporation pursuant to the provisions of this Act." Section 207(b). Although the court conducted a hearing on June 10, 1974, no findings have been made. Second, the board of directors of the Association must deliver the Final System Plan adopted by the Association to both Houses of Congress and to the Committee on Interstate and Foreign Commerce of the House of Representatives and the Committee on Commerce of the Senate for approval. Section 208(a).[9] Third, after Congressional approval, the conveyances take place only at the direction of the Special Court within ten days after deposit of the consideration by Conrail. Section 303(b).

■■ Thus, before plaintiffs can be exposed to the alleged harm, there must be a judicial determination by a Section 77 reorganization court followed first by Congressional action, and finally judicial action by the Special Court. Faced with this triple contingency, the plaintiffs

cannot be said to have been exposed to harm. Until these contingencies occur, only an abstract issue appears; and "abstract issues do not invoke the jurisdiction of the courts." McCahill v. Borough of Fox Chapel, 438 F.2d 213, 215 (3d Cir. 1971). "As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." United Public Workers of America v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (footnote omitted).

We are persuaded that the teachings of Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), and Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), control the issues dealing with the ultimate conveyance of railroad properties. In *Communist Party* the Court ruled that the mere possibility of Section 7(h) of the Subversive Activities Control Act and a regulation issued thereunder affecting the officers of the Party was not sufficient to present a live controversy. "The duties imposed by those provisions will not arise until and unless the Party fails to register. At this time their application is wholly contingent and conjectural." 367 U.S. at 106, 81 S.Ct. at 1416. However, when the Party members subsequently appealed from an order directing them to register under the Act, the Court ruled in *Albertson* that the claims were ripe for adjudication. Accordingly, we conclude that plaintiff's contention that the conveyance of the rail properties offends the due process clause is not ripe for adjudication.

### III.

Article I, Section 8, Clause 4 requires "uniform laws on the subject of Bank-

---

9. Sec. 208(a) *General.*—The Board of Directors of the Association shall deliver the final system plan adopted by the Association to both Houses of Congress and to the Committee on Interstate and Foreign Commerce of the House of Representatives and the Committee on Commerce of the Senate. The final system plan shall be deemed approved at the end of the first period of 60 calendar days of continuous session of Congress after such date of transmittal unless either the House of Representatives or the Senate passes a resolution during such period stating that it does not favor the final system plan.

ruptcies throughout the United States." Plaintiffs contend that because the Act must be geographically uniform in application, Hanover National Bank v. Moyses, 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902), it is facially unconstitutional because it provides that only rail properties of railroads in reorganization in the "Region" may be designated for transfer to Conrail. Section 206(c), (d). By definition the Region is limited to seventeen northeastern and midwestern states, the District of Columbia, and certain portions of contiguous states.[10]

The defendants' answer to these arguments is that, insofar as the Act is an exercise of the bankruptcy process, it is uniform: all Class I railroads in reorganization are in fact located within the defined Region, and there is no discriminatory treatment of creditors within or without the Region. Alternatively, defendants contend that the Region was defined for purposes of statutory provisions based on Congress' power under the commerce clause, which is not subject to the requirement of uniformity.

The court is divided on this issue. Judges Fullam and Bechtle are of the view that certain provisions of § 207(b) (*see ante* pages 514–515, n. 4) offend the constitutional requirement of uniformity. These provisions mandate dismissal of the Section 77 proceeding if the procedures of the Act are rejected. Their analysis and conclusions are set forth in Part II of Judge Fullam's separate opinion.

■ For my part, without reaching defendants' alternate contention that the

Act finds constitutional support under the commerce clause, I am persuaded that, in the context of the circumstances of this case, the Act does not offend Article I, Section 8, Clause 4.

*Hanover Bank* instructs that "[t]he laws passed on the subject [of bankruptcies] must, however, be uniform throughout the United States, but that uniformity is geographical and not personal. . . ." 186 U.S. at 188, 22 S.Ct. at 860. We believe that the Founding Fathers' requirement of uniformity was mandated to prevent Congressional geographical discrimination of creditors or debtors. But the 1973 Act is geographically uniform with respect to creditors' claims. No provision of the Act restricts the right of any creditor wheresoever located to obtain relief because of regionalism. If there is a facial geographic restriction, it would apply to regional or non-regional debtor railroads only. However, that is not this case. We are not confronted with a proper case or controversy involving a constitutional challenge to the Act brought by a debtor railroad inside or outside the Region. The challenge is brought by *creditors* within the Region whose claims are treated alike. Accordingly, instructed by the rule of United States v. Raines, 362 U.S. 17, 21, 80 S. Ct. 519, 522, 4 L.Ed.2d 524 (1960) that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which , its application might be unconstitutional",[11] I do not reach the

---

10. The Act is entitled "Regional Rail Reorganization Act of 1973." Section 101(b) states:

> (b) *Purposes.*—It is therefore declared to be the purpose of Congress in this Act to provide for—
>
> (1) the identification of a rail service system in the midwest and northeast region which is adequate to meet the needs and service requirements of this region and of the national rail transportation system. . . .

Section 102(13) declares that " 'Region' means the States of Maine, New Hampshire,

Vermont, Massachusetts, Connecticut, Rhode Island, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, Ohio, Indiana, Michigan, and Illinois; the District of Columbia; and those portions of contiguous States in which are located rail properties owned or operated by railroads doing business primarily in the aforementioned jurisdictions (as determined by the Commission by order). . . ."

11. The very foundation of the power of the federal courts to declare Acts of Congress unconstitutional lies in the power and duty

question of whether the Act may not survive a constitutional attack brought by a debtor railroad located outside the Region. Thus, I would hold that as to plaintiff-creditors, the Act does not offend the uniformity requirements of Article I, Section 8, Clause 4.

of those courts to decide cases and controversies properly before them. This was made patent in the first case here exercising that power—"the gravest and most delicate duty that this Court is called on to perform." Marbury v. Madison [5 U. S. 137] 1 Cranch 137, 177–180 [2 L.Ed. 60]. This Court, as is the case with all federal courts, "has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Liverpool, New York & Philadelphia S. S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39 [5 S.Ct. 352, 355, 28 L.Ed. 899]. Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional. United States v. Wurzbach, 280 U.S. 396 [50 S.Ct. 167, 74 L.Ed. 508]; Heald v. District of Columbia, 259 U.S. 114, 123 [42 S.Ct. 434, 435, 66 L.Ed. 852]; Yazoo & Mississippi Valley R. Co. v. Jackson Vinegar Co., 226 U.S. 217 [33 S.Ct. 40, 57 L.Ed. 193]; Collins v. Texas, 223 U.S. 288, 295–296 32 S.Ct. 286, 288, 56 L.Ed. 439]; New York ex rel. Hatch v. Reardon, 204 U.S. 152, 160–161 [27 S.Ct. 188, 190–191, 51 L.Ed. 415]. Cf. Voeller v. Neilston Warehouse Co., 311 U.S. 531, 537, 61 S.Ct. 376, 379, 85 L.Ed. 396; Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 513 [57 S.Ct. 868, 874, 81 L.Ed. 1245]; Virginian R. Co. v. System Federation, 300 U.S. 515, 558 [57 S.Ct. 592, 605, 81 L. Ed. 789]; Blackmer v. United States, 284 U.S. 421, 442 [52 S.Ct. 252, 257, 76 L. Ed. 375]; Roberts & Schaefer Co. v. Emmerson, 271 U.S. 50, 54–55 [46 S.Ct. 375, 376–377, 70 L.Ed. 827]; Jeffrey Mfg. Co. v. Blagg, 235 U.S. 571, 576 [35 S.Ct. 167, 169, 59 L.Ed. 364]; Tyler v. Judges

## IV.

Finally plaintiffs contend that the Act effects a taking of their property by compelling operation of Penn Central's rail properties at an irreversible loss during the period before adoption of the Final System Plan.[12] They urge that

of the Court of Registration, 179 U.S. 405 [21 S.Ct. 206, 45 L.Ed. 252]; Ashwander v. TVA, 297 U.S. 288, 347–348 [56 S.Ct. 466, 483–484, 80 L.Ed. 688] (concurring opinion). In Barrows v. Jackson, 346 U. S. 249 [73 S.Ct. 1031, 97 L.Ed. 1586], this Court developed various reasons for this rule. Very significant is the incontrovertible proposition that it "would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." Id., at 256 [73 S.Ct. at 1035.] The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined. The Court further pointed to the fact that a limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were in fact concretely presented. We might add that application of this rule frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.

362 U.S. at 20–22, 80 S.Ct. at 522. (footnote omitted).

12. Section 304(f) of the Act provides for interim abandonment if certain conditions are met:

After the date of enactment of this Act, no railroad in reorganization may discontinue service or abandon any line of railroad other than in accordance with the provisions of this Act, unless it is authorized to do so by the Association and unless no affected State or local or regional transportation authority reasonably opposes such action, notwithstanding any provision of any other Federal law, the constitution or law of any State, or decision or order of, or the pendency of any proceeding before any Federal or State court, agency, or authority.

At oral argument the Penn Central Trustees represented that requests for abandonment were filed with the office of the Association, but as of June 3, 1974—over five months after the effective date of the Act —the office of the Association was not yet fully functioning.

"the Act is unconstitutional in that 1) it denies them their present right to terminate their investment in a hopelessly losing railroad; and 2) it provides no assurance that plaintiffs will in all events be paid just compensation on account of such forced continued operations." [13]

That Congress expected losses during implementation of the Final System Plan is evidenced by Section 213 which provides that the Secretary of Transportation may make payments for certain specific interim losses:

(a) *Emergency Assistance.*—The Secretary is authorized, pending the implementation of the final system plan, to pay to the trustees of railroads in reorganization such sums as are necessary for the continued provision of essential transportation services by such railroads. Such payments shall be made by the Secretary upon such reasonable terms and conditions as the Secretary establishes, except that recipients must agree to maintain and provide service at a level no less than that in effect on the date of enactment of this Act.

(b) *Authorization for Appropriations.*—There are authorized to be appropriated to the Secretary for carrying out this section such sums as are necessary, not to exceed $85,000,000, to remain available until expended.[14]

It becomes quickly apparent that the limited amounts of these funds—available to railroads in reorganization in the region—have not been specially designated to meet challenges of unconstitutional erosion. Moreover, the full statutory authorization has not been appropriated nor is there total agreement between the Secretary of Transportation and the trustees and creditors as to the nature of the payments to be made under Section 213 and those to be made under Section 215.[15] Congress has only appropriated $35 million of the $85 million authorized. By February 19, 1974, a tentative, partial solution was reached between the trustees and the Secretary as to $10.8 million, which required approval by the Section 77 reorganization court. In approving the trustees' petition the court observed:

Section 215 of the Act authorizes the advance of up to $150 million for the purpose of interim acquisition, maintenance and improvement of rail assets which would eventually be con-

---

13. Connecticut General Plaintiffs' Brief, 30. The Penn Central Company contends that an unconstitutional taking of the Penn Central railroad's property occurred on January 2, 1974; that the compulsory continuation of operations during the interim period without payment of just compensation abridges the Fifth Amendment; and that since the debtor estate is being continually depleted, plaintiff, as an unsecured creditor, is presently being injured. Penn Central Company's Memorandum in Support of its Motion for Summary Judgment, 10–14.

14. Significantly there is no explicit reference to the Court of Claims.

15. *Sec. 215.* Prior to the date upon which rail properties are conveyed to the Corporation under this Act, the Secretary, with the approval of the Association, is authorized to enter into agreements with railroads in reorganization in the region (or railroads leased, operated, or controlled by railroads in reorganization) for the acquisition, maintenance, or improvement of railroad facilities and equipment necessary to improve property that will be in the final system plan. Agreements entered into pursuant to this section shall specifically identify the type and quality of improvements to be made pursuant to such agreements. Notwithstanding section 210(b) of this title, the Association shall issue obligations under section 210(a) of this title in an amount sufficient to finance such agreements and shall require the Corporation to assume any such obligations. However, the Association may not issue obligations under this section in an aggregate amount in excess of $150,000,000. The Secretary may not enter into any agreements under this section until he issues regulations setting forth procedures and guidelines for the administration of this section. The Corporation shall not be required under title III of this Act to compensate any railroad in reorganization for that portion of the value of rail properties transferred to it under this Act which is attributable to the acquisition, maintenance, or improvement of such properties under this section.

veyed to the new operating corporation contemplated by the statute, as part of the final system plan (increases in value resulting from such expenditures are not to be reflected in the consideration to be paid for such transfers, and the obligation to repay is to be assumed by the new corporation).

The Secretary has thus far declined to approve any grants under § 213, and is not yet in a position to implement § 215. To meet the present emergency, the Secretary is apparently willing to use § 213 funds, but not on a grant basis. The proposal contemplates that, instead of providing funds to the Trustees to meet operating expenses, the Secretary will, in effect, transfer funds equal to certain current installments due on equipment, and in return acquire a *pro tanto* interest in the Trustees' equity in that equipment. Meanwhile, it is contemplated that the parties will attempt to determine the extent to which § 215 funds can appropriately be made available to relieve future cash shortages.

A hearing on the Trustees' petition was held on February 26, 1974. The creditor interests all expressed, in varying degrees, their conviction that the proposed financing was contrary to the intent of the Regional Rail Reorganization Act of 1973, and also would violate the constitutional rights of the creditors. The New Haven Trustee flatly opposes the transaction. Substantially all of the other creditor interests, and the Trustees, expressed their willingness to have the Court approve the transaction, so long as it was clearly understood that this would not create a precedent for similar approvals in the future, and that all parties expressly reserved their rights to press all constitutional and legal arguments at the forthcoming hearings on the issues involved in § 207 of the Reorganization Act and in all other proceedings involving their rights under, and the constitutionality of, the statute.

As all parties recognize, unless these funds are provided immediately, the Trustees will be forced to default in the payments due on equipment in which they have an equity in excess of $70 million. Section 77(j) of the Bankruptcy Act severely restricts the power of a reorganization court to preclude equipment creditors from exercising the rights granted under the financing documents. No other source of cash to meet these installments has been suggested (and it is difficult to imagine any alternative source which would not involve repayment, and thus the same constitutional issues as in the present proceeding).[16]

---

16. In re Penn Central Transportation Co., Debtor, Memorandum in Support of Order No. 1480 (March 1, 1974) (pp. 1–3).

Immediately after the enactment of the 1973 Act, the Trustees applied to the Secretary of Transportation for a grant under Section 213, to meet a projected cash shortfall of approximately $12 million anticipated to occur by March 1, 1974. There were three difficulties: (1) the grants were supposed to be made pursuant to regulations prescribed by the Secretary, and the Secretary had not yet prescribed any regulations; (2) The Act requires, as a condition of any such grant, that the recipient agree to maintain rail service at the level of January 2, 1974, and there were problems of interpretation on that, as well as questions about whether the Trustees could make any such commitment in good faith, or without violating the constitutional rights of creditors; and (3) It was the firm position of the Secretary of Transportation that the preferred vehicle for interim financing would be loans for capital improvements under Section 215, rather than grants under Section 213.

There were, however, many problems standing in the way of use of any Section 215 money. (These funds, to be used for capital improvements and acquisitions, are in effect loans made to Conrail, in advance of its coming into existence.) In addition to the fact that such capital improvements were to be limited to the rail properties which would be designated in the Final System Plan, and which were therefore not presently identifiable, there would be no money available under Section 215 until

**A.**

Our first responsibility is to determine whether the interim erosion issue is presently ripe for adjudication. The predicate of this issue is that, absent permissive interim abandonment, the Act mandates continued operations of Penn Central until the Final System Plan is adopted. Plaintiffs contend that a compulsory interim operation for a virtually indefinite length of time at large operating losses continues to erode the Penn Central estate so as to constitute a condemnation of the assets without fair and just compensation. To decide whether this contention presents a ripe, and therefore justiciable, issue requires an overview of the Penn Central operations. A statement of operational losses being sustained by Penn Central, while under Section 77 reorganization, is revealed in the stipulations filed by the parties. During the period that began June 21, 1970, until December 31, 1973, Penn Central sustained ordinary net losses in an amount which approximates $851,000,000.00.[17]

It is also stipulated that for the two months ended February 28, 1974, Penn Central had a deficit in net railway operating income, a deficit in total income, a deficit in income available for fixed charges and deficit net income, as those items are determined in accordance with accounting regulations of the Interstate

United States Railway Association had been formed and could issue government-guaranteed debt securities.

By February 19, 1974, a proposal for a patchwork solution had been worked out between the Trustees and the Department of Transportation. The DOT would put up $10.8 million, by directly meeting certain installment payments due on equipment, and would be subrogated, *pro tanto*, to the Trustees' equity in that equipment. In effect, the Trustees would sell a part of their equity in certain rail equipment to the Department of Transportation, but with the right to redeem it by paying back the money without interest. A hearing was held on this proposal on February 26, 1974, and the Section 77 reorganization court approved it, over the objections of various creditors, by Order No. 1480. In a Supplemental Memorandum and Order (No. 1509) the court denied a motion for reconsideration. The orders are now under appeal.

Thus, of the $35 million thus far appropriated under Section 213 of the Act, $10.8 million has been expended to purchase a part of Penn Central's equity in some of its equipment.

17. During this same period, the Penn Central trustees expended in operating rail properties approximately $137,500,000 of non-recurring cash items as follows:

| | |
|---|---:|
| Trustees' Certificate Drawdowns | $100,000,000 |
| Tenants Tax Escrow Account | 3,100,000 |
| Proceeds from New Haven Property Sale | 9,100,000 |
| Sale of Freight Cars to P & LE | 7,300,000 |
| M.B.T.A. Settlement | 9,100,000 |
| Proceeds from sale of stock of Madison Square Garden Corp. | 2,400,000 |
| Proceeds from sale of securities held in Contingent Compensation Fund | 6,500,000 |
| **TOTAL** | **$137,500,000** |

They expended $2,100,000 in proceeds from sale of mortgaged properties in connection with the Selkirk Yard improvement and $15,700,000 in proceeds from the "Agnes" Flood Loan.

They expended in operating rail properties approximately $157,000,000 in income derived from Penn Central's non-rail properties.

They deferred payment of approximately $241,000,000 in state and local taxes, of which some $44 million to $48 million is allocable to the pre-reorganization period. These taxes ($241,000,000) are included in the ordinary net losses.

They deferred payment of approximately $101,000,000 in rentals on leased line properties. The deferred leased line rentals are included in the ordinary net losses.

Commerce Commission. As previously stated, the Penn Central reorganization court has ruled that the railroad is not "reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act."

The book value—and we emphasize that this is not a market value or liquidated value—of total assets is recorded as $4,419,917,759 as of December 31, 1971.[18] The trustees report that as of December 31, 1971, 26,254 claimants filed Proofs of Claim, claiming a gross amount of $3,348,620,840.[19] Fifty-one secured creditors filed timely proofs of claim in the amount of $1,062,734,988. Ten indenture trustees filed claims in the amount of $963,135,138. Thirty-five individual bondholders claimed $81,911,646. Six claimants filed claims arising from conditional purchases of equipment and property in the amount of $17,688,204. An accountants' report indicates that on June 21, 1970, the long-term debt in respect of mortgage bonds and collateral trust bonds, exclusive of railroad equipment obligations, was $687,692,000.[20] This, of course, is only a partial listing of the claims.[21] A single unsecured creditor in these proceedings, the Penn Central Company, claims an approximate amount of $41,800,000.

The Court of Appeals for the Third Circuit suggests: "If, as some of the reports filed by the trustees suggest, it is already clear that such a reorganization is not feasible,[11] then this reorganiza-

11. *See, e. g.,* Trustees' Interim Report of February 1, 1973; Memorandum accompanying July 2, 1973 Plan of Reorganization of the Penn Central Transportation Company and Other Railroad Corporations (June 29, 1973).[22]

tion is already at the point where the erosion of the estate in deficit operations must cease and a liquidation alternative must be considered if the secured creditors or other interested parties insist upon such consideration."

Over a year ago the Section 77 reorganization Court warned: "1. *Erosion.* While the precise calculations have not been fully developed, the record justifies the conclusion that post-reorganization deferrals and unpaid administration claims have already eroded the Debtor's estate to the extent of about $500 million. Whether the constitutional limit has been exceeded depends primarily upon how the remaining assets are to be valued; and this in turn may well depend upon how those assets are to be used at the conclusion of this reorganization. Under any view of the matter, it seems clear that the point of unconsti-

18. Annual Report to ICC, 1971, p. 8.

19. Trustees' Plan for Reorganization, April 1, 1972, Attachment 5, pp. 6–7 (Doc. No. 3033). The trustees estimate an aggregate liability of $1,583,076,820 from the *filed* claims.

20. *Ibid.*, at 14–15.

21. In addition to the filed claims there is the matter of priority claims incurred against the estate during the Section 77 reorganization proceedings:

 E. *Growth in priority claims against the estate.*

 Deprived of an adequate cash flow, the Penn Central estate has accumulated substantial priority claims ahead of all pre-bankruptcy interests. Conservatively estimated, these priority claims already aggregate at least $300 million. On a status quo assumption, another $100 million would be added in 1973. As a result, the value of the estate has already been sub-

stantially eroded and the Trustees are presently unable to prevent continuing erosion. In addition to these items, there is a priority charge of some $200 million a year for interest and amortization of equipment debt and equipment lease rentals which must continue to be serviced out of future cash resources whether or not such charges are earned.

 There is, simply, not enough cash to cope with continuing claims and to embark upon the capital improvement programs which would permit a continuation of service improvements. Not only is the ability to preserve earning power jeopardized, but Penn. Central's essential public services cannot be sustained on this basis.

  \*  \*  \*  \*  \*

Trustees' Interim Report of January 1, 1973, p. 4 (Doc. No. 4911).

22. In the Matter of Penn Central Transportation Co., Debtor, (Columbus Option Cases), 494 F.2d 270, 283 (3d Cir. 1974).

tutionality is fast approaching, if it has not already arrived. . . . On the basis of the record to date, it appears highly doubtful that the Debtor could properly be permitted to continue to operate on its present basis beyond October 1, 1973." In re Penn Central Transportation Company, 355 F.Supp. 1343, 1344, 1346 (E.D.Pa.1973).

Cognizant of massive operational losses of $851,000,000 during the present reorganization proceedings, and cognizant also that unsecured creditor as well as secured creditor interests are squarely before this court, we are persuaded that a significant possibility exists that a point of erosion either has been or may soon be reached so that it can be said that plaintiffs' contention of interim unconstitutional taking by continued loss operations is ripe for adjudication. Having determined that there is a controversy ripe for adjudication, we now examine the merits of plaintiffs' contention.

### B.

The defendants acknowledge that if a point is reached where continued loss operations during the interim amount to an unconstitutional taking,[23] the Act does not explicitly provide for the payment of just compensation.

They insist, however, that plaintiffs have an implied remedy at law—a suit in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491, for just compensation from the United States. The Tucker Act confers jurisdiction on the Court of Claims:

> to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.[24]

The applicability of the Tucker Act is vital to the defendants' position. At oral argument counsel conceded that if a point was reached at which continued mandatory operations created losses of such an amount as to constitute a Fifth Amendment taking, the operators would then be entitled to just compensation, and that without an implied Court of Claims remedy, the 1973 Act would be unconstitutional as to these plaintiffs.[25]

23. [T]here are limits beyond which . . . [the] public interest cannot be served without violating the constitutional prohibition against appropriation of private property for public use without just compensation. New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1971); cf. Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920). These limitations are measured both in terms of the amount of erosion of the Debtor's estate which can be permitted to occur before impairing liquidation value, and in terms of the length of time that is reasonable for assessing the ultimate prospects of achieving sufficient profitability to support a valid recapitalization of the enterprise.
In Re Penn Central Transportation Company, 347 F.Supp. 1346, 1366 (E.D.Pa.1972).

24. The district courts have concurrent jurisdiction of claims not exceeding $10,000. 28 U.S.C. § 1346.

25. JUDGE ALDISERT: All right now, Mr. Cutler, assuming an unconstitutional taking by means of continued interim operation, without a Tucker Act remedy, would the 1973 Act be unconstitutional?
MR. CUTLER: You are saying assuming that a point might be reached before the consummation of the new plan in which the constitutionally permissible point of erosion had been reached, before that could be carried out?
JUDGE ALDISERT: Yes, sir.
MR. CUTLER: And that a Tucker Act remedy was not available?
JUDGE ALDISERT: Yes.
MR. CUTLER: I think I would answer that, Judge Aldisert, by saying under those circumstances, Congress would then have decreed a taking by the provision of this Act for which it had removed any adequate remedy at law by way of the Tucker Act suit. In that case, the Act as a whole would probably be unconstitutional. We would agree with that.
We think it would be possible at that point though to save most of the Act by construing I think it is 303 where the court is required to transfer the properties before it has passed on the value of

■ The defendants concede that the United States, as sovereign, may not be sued without its consent. "[T]he terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586, 61 S.Ct. 767, 770 (1941). Consent to be sued must be established in an act of Congress, and such an act, "since it is a relinquishment of a sovereign immunity, must be strictly interpreted." Ibid., at 590, 61 S.Ct. at 771; see United States v. King, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Specifically defendants urge that a statutory grant of consent to a suit against the United States for any unconstitutional taking by reason of interim losses is conferred on the Court of Claims by implication because the Regional Rail Reorganization Act of 1973 shows no affirmative Congressional intent to deprive that court of its Tucker Act jurisdiction in cases where claims for unconstitutional takings are made.

The plaintiffs counter with a reference to the legislative history to demonstrate that there was a specific intention to limit the obligations of the United States to the express provisions and explicit limitations contained in the Act. Thus the issue is joined, and the solution turns on the vexing problem of statutory construction.

We cannot demean the importance of proper statutory construction in the precise matter at hand. On proper statutory construction stands or falls the constitutionality of important provisions of the statutory schema. The defendants, joined by the intervening Penn Central trustees, mount a formidable argument, reminding us that when "the validity of an act of the Congress is drawn in question, and . . . a serious doubt of constitutionality is raised, it is a cardi-

---

what is to be given in exchange, by construing that as unconstitutional, that particular provision, and saving the rest of the statute under the severability clause, which would have the result that the court could delay the transfer until after it had passed on the values, and as to erosion, if the interim or the final point, the limit of constitutionally permissible erosion, had been reached before the plan was consummated, then I suppose Judge Fullam, as the reorganiztion judge, and the other judges would be free, since the compulsory transfer would have been struck down as unconstitutional, to terminate the proceedings, if they thought that was appropriate.

R. 68–69.
Penn Central Trustees have expressed a similar position:

B. *Interim Erosion.* Moreover, there is the further objection to the Act already referred to—the lack of any assurance that the estate will be compensated for erosion during the many months which must elapse before Penn Central's rail properties are conveyed. Financial erosion—the accumulation of real estate taxes, interest on secured debt, leased line rentals and a variety of administrative expenses—continues to accumulate at the expense of the owners. Physical erosion, as noted above, is likewise continuing, as the rail properties of the debtor continue to suffer from inadequate maintenance.

The Trustees have been advised that a Tucker Act remedy may be available to them to recover these erosion losses. The Trustees will attempt to secure a Supreme Court ruling that, if a constitutionally impermissible level of erosion was reached by January 2, 1974, the date the Act became law, a "taking" of Penn Central's rail properties occurred at least by that date, and that a Tucker Act remedy exists for erosion occurring thereafter. Section 304(f) of the Act provides that "after the date of enactment of this Act, no railroad in reorganization may discontinue service or abandon any line of railroad other than in accordance with the provisions of this Act, * * *". While the planning agency, the United States Railway Association, may authorize a service to be discontinued or a line to be abandoned (unless local authorities reasonably object), this mandate by Congress has the effect of requiring Penn Central to continue operations—notwithstanding the losses it will incur—until a final system plan is implemented. Again, however, the Trustees are advised that unless and until the Supreme Court has ruled that the United States can be required to reimburse the Penn Central estate for its interim losses, they cannot as fiduciaries rely exclusively on a Court of Claims recovery.

Trustees' April 3, 1974 Report on Reorganization Planning, pp. 5–6 (Doc. No. 7304).

nal principle that . . . [courts] will first ascertain whether a construction of the statute is *fairly possible* by which the question may be avoided." United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971), citing Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (emphasis supplied). *See also,* American Communications Assn, C. I. O. v. Douds, 339 U.S. 382, 407, 70 S.Ct. 674, 94 L.Ed. 925 (1950); United States v. Congress of Industrial Organizations, 335 U.S. 106, 120–121, 68 S.Ct. 1349, 92 L.Ed. 1849

(1948). The Penn Central trustees emphasize that "the Act contains no fewer than *thirteen* provisions repealing or making inapplicable the provisions of various laws or excluding the jurisdiction of federal courts on various subjects. Since none of these thirteen provisions excludes a Tucker Act remedy— although, as plaintiffs themselves argue, Congress was intensely aware of the possibility of such a remedy—Congress must be deemed to have deliberately rejected the readily available option of including such an exclusionary provision in the Act." [26]

---

**26.** Penn Central Trustees' Brief in Opposition to Plaintiffs Motion for Summary Judgment, p. 6.

The thirteen repealing or jurisdiction-excluding provisions in the Act are found in Sections 202(a), 205(c)(2), 206(d)(3), 207(b), 209(a), 209(b), 303(b)(2), 303(d), 304(c), 304(f), 601(a)(2), 601(b) and 601(c).

Sections 202(a)(10) and 205(c)(2) exempt United States Railway Association (USRA) and the Rail Services Planning Office, respectively, from the provisions of Section 3709 of the Revised Statutes, 41 U.S.C., Section 5. Section 206(d)(3) provides that certain determinations by USRA and the ICC shall not be reviewable in any court. Section 207(b) provides that appeals from orders made under that subsection may be taken only to the Special Court, whose decisions are not subject to further review. Section 207(b) also in effect repeals part of the jurisdiction created by Section 77 of the Bankruptcy Act by requiring dismissal of Section 77 proceedings in certain circumstances.

Section 209(a) provides that the final system plan shall become effective after review by Congress "notwithstanding any other provision of law" and is "not subject to review by any court except in accordance with this section." Here Congress provides that no court may review the contents of the final system plan—the document which establishes what railroad properties shall be taken—and that the plan is to become effective notwithstanding any other provisions of law. Obviously nothing here purports or attempts to exclude a Tucker Act remedy for just compensation for the properties so taken. Section 209(b) authorizes the Judicial Panel on Multi-District Litigation to create a Special Court and to consolidate therein all judicial proceedings with re-

spect to the final system plan, and to issue rules for the conduct of the Panel's functions. The section goes on to provide that "no determination by the panel [on Multi-District Litigation] under this subsection may be reviewed in any court." Here again Congress demonstrated that it well knew how to exclude jurisdiction of federal courts when it wished to do so.

Section 303(b)(2) provides that mandatory conveyances ordered pursuant to the Act by the Special Court "shall not be restrained or enjoined by any court." Section 303(d) provides that, after the Special Court enters its orders with respect to compensation which are authorized by prior subsections of Section 303 an appeal may be taken to the Supreme Court and "that such appeal is exclusive." This makes a single appeal to the Supreme Court the only means by which interested parties may question whether the Special Court has properly performed the functions assigned to it by Section 303. Since those functions do not include consideration of any question whether the compulsory conveyance pursuant to the Act constitutes a taking of property or the amount of just compensation due therefor, Section 303(d) in no way attempts to exclude a Tucker Act remedy for such a taking. To the contrary, Section 303(d) yet again demonstrates that Congress was fully aware of the necessity of excluding various types of jurisdiction and did so expressly when it wished to do so.

Section 304(c) provides that railroad abandonments permitted under the section may be made "notwithstanding any provision of the Interstate Commerce Act" or of other laws. Section 304(f) provides that the inhibition on interim abandonments imposed by that subsection prevails "notwithstanding any provision of any other Federal law, the constitution or law of

On their part the plaintiffs also turn to the text of the Act, describing it as "a preemptive system of judicial participation [with] respect to the final system plan. Section 209 mandates the empaneling of the Special Court and the consolidation before it of 'all judicial proceedings with respect to the final system plan'. Section 303(c) endows the Special Court with the duty to review the consideration to be received for the properties conveyed and ultimately the authority under Section 303(c)(2)(C) to enter a deficiency judgment against Conrail. The exclusive appeal from the Special Court's findings is provided in Section 303(d)." [27]

The legislative history reveals that Senator Vance Hartke, who would later be one of the Managers of the bill on the part of the Senate, observed that if Congress did not act by providing the creditors with stock in Conrail, "there is the distinct possibility . . . that a number of these people could make a claim against the Government which could be sustained in the Court of Claims." [28]

■ Especially significant in the legislative history of the Act are the remarks recorded during the discussion on the conference report accompanying H. R. 9142 in a colloquy between two of the "*Managers* on the Part of the House":

*Mr.* [Dan] *Kuykendall.* "Mr. Speaker, I would like to ask the gentleman from Washington one point, and that is the matter of the deficiency judgment. There was a lot of colloquy in the original debate which expressed fears that the Federal Court had the key to the Treasury.

"Will the gentleman give us his interpretation of the guarantees we have to keep that from happening in the court proceedings?"

*Mr.* [Brock] *Adams.* "Mr. Speaker, there is a definite limitation on the total amount that can be authorized under this bill. Any amounts that go beyond that, or the shifting of the way in which it is spent, is to be approved by an Act of Congress, to be signed by the President. . . . [I]t was the clear intent of the managers that any amount other than common stock [of Conrail] was to be at the lowest possible limit to meet the constitutional guarantees."

\*　\*　\*　\*　\*　\*

*Mr. Kuykendall.* "There is no way the Federal Court may assess the taxpayers or this Congress on the judgments of the creditors, is that correct?"

*Mr. Adams.* "The gentleman is correct."

*Mr. Kuykendall.* "There is no way they can assess the Congress for the money?"

*Mr. Adams.* "The gentleman is correct." [29]

We are persuaded that the legislative history supports the conclusion that Congress intended that financial obliga-

---

any State, or decision or order of, or the pendency of any proceeding before any Federal or State court, agency, or authority."

Section 601(a)(2) provides that "the antitrust laws are inapplicable with respect to any action taken to formulate or implement the final system plan where such action was in compliance with the requirements of such plan." Section 601(b) similarly makes inapplicable the provisions of the Interstate Commerce Act "whenever a provision of any such Act is inconsistent with this Act." And Section 601(c) provides that certain provisions of the National Environmental Policy Act of 1969 "shall not apply with respect to any action

taken under authority of this Act before the effective date of the final system plan." These provisions are contained in Title VI of the Act, in a subtitle headed "Relationship to Other Laws." If Congress had wished also to exclude the application of the Tucker Act, it obviously would have added such an exclusion to the very explicit provision of Section 601 excluding the applicability of various other laws.

*Ibid.*, at 6–9 (footnote omitted).

27. Connecticut General's Brief, 59–60.

28. 119 Cong.Rec.S. 23783–84 (1973).

29. 119 Cong.Rec.H. 11876 (1973).

tions be limited to the express terms of the Act. Article I, Section 9, Clause 7 provides that no money shall be drawn from the Treasury of the United States except in consequence of an appropriation made by law. Section 213(b), *supra*, and Section 214 [30] entitled "Authorization for Appropriations" place an express ceiling on expenditures. Section 210 describes the maximum obligational authority of the Association, and the authorization for appropriation is limited to "such amounts as are necessary to discharge the obligations of the United States arising *under this section*." (Emphasis supplied.) Judicial review is delineated with specificity in Sections 209(a) and 303 with no mention of the Court of Claims.

We were taught by Justice Frankfurter "that the troublesome phase of [statutory] construction is the determination of the extent to which extraneous documentation and external circumstances may be allowed to infiltrate the text on the theory that they were part of it, written in ink discernible to the judicial eye." [31] John Chipman Gray often quoted a sermon by Bishop Hoadley that "[w]hoever hath an absolute authority to interpret any written or spoken laws, it is he who is truly the law-giver to all intents and purposes, and not the person who first wrote or spoke them." [32]

For this court to interpret the Act in a manner contrary to its explicit terms, contrary to the express representations of the bill's managers at the conference committee discussions, and to construe this Act in a manner which will expose the United States Treasury to presently incalculable, but, in any event, substantially formidable claims would be a flagrant violation of the separation of powers doctrine. If we did this, the judiciary would truly have become the "law-giver" for substantial federal appropriations; this in itself would raise serious constitutional problems.

To accept the government defendants' contention would require judicial legislation on a grand, if not arrogant, scale. Justice Holmes told us "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." [33] To read a Tucker Act remedy into the Act would

30. Sec. 214(a) *Secretary.*—There are authorized to be appropriated to the Secretary for purposes of preparing the reports and exercising other functions to be performed by him under this Act such sums as are necessary, not to exceed $12,500,000, to remain available until expended.

(b) *Office.*—There are authorized to be appropriated to the Commission for the use of the Office in carrying out its functions under this Act such sums as are necessary, not to exceed $5,000,000, to remain available until expended. The budget for the Office shall be submitted by the Commission directly to the Congress and shall not be subject to review of any kind by any other agency or official of the United States. Moneys appropriated for the Office shall not be withheld by any agency or official of the United States or used by the Commission for any purpose other than the use of the Office. No part of any other moneys appropriated to the Commission shall be withheld by any other agency or official of the United States to offset any moneys appropriated pursuant to this subsection.

(c) *Association.*—There are authorized to be appropriated to the Association for purposes of carrying out its administrative expenses under this Act such sums as are necessary, not to exceed $26,000,000 to remain available until expended.

31. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 529 (1947).

Justice Frankfurter also reminded us that "Mr. Justice Holmes reached meaning easily, as was true of most of his results, with emphasis on the language in the totality of the enactment and the felt reasonableness of the chosen construction. He had a lively awareness that a statute was expressive of purpose and policy, but in his reading of it he tended to hug the shores of the statute itself, without much reinforcement from without," supra, at 532.

32. Gray, Nature and Sources of the Law, 102, 125, 172 (2d Ed. 1921).

33. Southern Pacific Co. v. Jensen, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting).

be a movement of the mass and not simply the particles. We simply lack such power.

## V.

Accordingly, we hold that Section 304(f), in requiring mandatory interim operations without providing a legal remedy to furnish fair and just compensation for an erosion of property beyond constitutional limits, offends the Fifth Amendment; that Section 303, the only provision of the Act pertaining to valuation of the railroad estate, in failing to provide a remedy for any unconstitutional erosion caused by mandatory interim operations under Section 304(f), is also defective; that because the effect of Section 207(b) precludes a form of liquidation under Section 77 of the Bankruptcy Act, it is constitutionally defective as set forth in Part II of the separate opinion of Judge Fullam; and that because of these conclusions the United States Railway Association must be enjoined from certifying a Final System Plan to the Special Court pursuant to Section 209(c).

An appropriate decree will issue (1) enjoining the United States Railway Association, the Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of the Treasury from enforcing the Regional Rail Reorganizational Act of 1973 in a manner inconsistent with this holding and (2) declaring as null and void designated sections of the Act.

FULLAM, District Judge.

In view of the number and complexity of the issues which have been presented in this case, it should occasion little surprise that there is a lack of total agreement among judges on all issues. With respect to the issues actually decided by the majority, I am in general agreement, although to some extent for slightly different reasons. But the majority fails to reach a number of issues which I feel

must be faced, not only because they are indeed ripe for decision but because the principal conclusion expressed by the majority—that the Regional Rail Reorganization Act of 1973 [1] is unconstitutional because it fails to provide compensation for interim erosion during the planning period—necessarily depends upon an evaluation of the nature and validity of the Act's provisions concerning mandatory conveyance of rail properties to Conrail. In short, I believe the majority has attempted to isolate an issue which cannot be isolated.

### I. *Prematurity*

Plaintiffs challenge the facial constitutionality of the Act on a variety of grounds, not all of which are necessarily ripe for decision. In considering which issues must be faced at this time, it is important to keep in mind the distinctions between concepts of standing, ripeness, and the need for injunctive relief.

Unquestionably, one or more of the parties to these lawsuits have standing to raise every issue which has been presented. That is, the statute affects these parties in particular, as distinguished from the public at large, in substantial ways. They thus meet the tests of Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

The question of whether all of the constitutional issues are ripe for decision requires us to analyze the inevitability of the alleged unconstitutional impact, whereas the immediacy of the alleged threat bears upon the propriety of injunctive relief.

By July 1, 1974, each of the reorganization courts will have made, or failed to make, findings pursuant to § 207(b) of the Act. Under the statute, the effect of these findings or non-findings (as affirmed or reversed by the Special Court within 80 days thereafter) will be either

---

1. The Regional Rail Reorganization Act of 1973 is referred to in this Opinion as the Act, the RRRA, or the statute.

that the statutory processes will inexorably apply to these estates, or that the § 77 proceedings will be dismissed. The plaintiffs assert that the § 207(b) proceedings themselves are unconstitutional on due process grounds. Surely this challenge is now ripe for decision; indeed, the defendants do not contend otherwise.

As set forth in Judge Aldisert's scholarly opinion, the existence and inevitability of staggering losses from continuing rail operations pose an immediate threat to the constitutional rights of the owners and creditors of the bankrupt estates. Plaintiffs contend that the effect of §§ 304(f) and 303 of the Act is to mandate continued loss operations for an indefinite period without hope of reimbursement, in derogation of both the taking and due process clauses of the Fifth Amendment. Since the majority has concluded that the ultimate conveyance issues are not now ripe for decision, the fact § 304(f) has been in force since January 2, 1974, and continues to require interim operations and losses, undoubtedly makes the interim erosion challenge ripe for decision.

Plaintiffs challenge the entire Act as a violation of the uniformity requirement of the bankruptcy clause, Article I, Section 8, Clause 4 of the Constitution. Again, this issue is undeniably ripe for decision.

Finally, plaintiffs pose a series of challenges to the statutory provisions which contemplate the mandatory transfers of rail assets to Conrail or to existing solvent carriers, at prices to be determined by the Special Court after the event, and to be paid in the form of a to-be-determined mixture of Conrail securities, undefined "other benefits," and possibly a limited amount of guaranteed obligations of USRA. Whether some or all of these "ultimate conveyance" issues are now ripe for decision is a more difficult question. Judge Aldisert views the possibility that a conveyance may never take place because of action taken by the reorganization court under § 207(b), the Congress, and the Special Court, as rendering inappropriate consideration of any of the ultimate conveyance issues. For me, the decision of this issue is not so simple.

No one doubts, and in fact the parties have stipulated, that Penn Central rail properties will be included in the Final System Plan. Equally certain is the fact that USRA will deliver to Congress a Final System Plan which is to become effective 60 session-days thereafter. In order to prevent the Plan from taking effect, one House of Congress must act affirmatively by passage of a resolution expressing disapproval of the Plan, § 208(a). Section 208(b) makes it the continuing duty of USRA to present final system plans to the Congress until one becomes effective. I cannot equate Congress' reservation of the right to veto the first Final System Plan, or even the second or third, to a situation in which Congressional action is necessary as a precondition to a Final System Plan becoming effective. I believe this Court must assume that the Act means what it says, and that the expressed intent of Congress would be carried out.

Once a Final System Plan is effective, *i. e.*, when the 60-day Congressional action period expires, the Special Court is required under § 303(b) to order conveyance of the property. There remains no discretionary role to be played by the Special Court, or any other court, at that point. Therefore, it is clear that if the reorganization court does not make § 207(b) findings that remove the railroad from the RRRA, conveyances are certain, save only amendment or repeal of the RRRA. Of course, the possibility of future legislative and executive action is always present during the judicial evaluation of the constitutionality of a statute, and does not render such adjudication premature.

The last potential exit would be a finding by the reorganization court that the RRRA "does not provide a process which would be fair and equitable to the estate of the railroad in reorganization," § 207(b). In this event, there would be no conveyance under the Act. In my

view, this possibility does not raise an issue of ripeness, but rather, a question more akin to abstention.

Under § 207(b), the reorganization court will have to consider at least some of the cluster of discrete issues concerning the ultimate conveyance provisions of the Act, including some of the constitutional issues raised by these cases. This is so because the reorganization court must consider the RRRA in its entirety in order to ascertain whether the process is fair and equitable to the estates. Moreover, it is highly improbable that a reorganization court could successfully reject the statute as unfair or inequitable under § 207(b) for reasons of less than constitutional magnitude. Indeed, the government's position at the June 10 hearing in the reorganization court was that nothing short of unconstitutionality would justify rejection of the Act under § 207(b). Thus, the issue is essentially whether it is preferable for the three-judge court to rule on the constitutional issues surrounding the conveyance provisions, either directly or in conjunction with plaintiffs' due process attack on § 207(b), before the reorganization courts act under § 207(b).

The policies embodied in 28 U.S.C. § 2282 appear applicable in this case. Enforcement of major federal legislation is sought to be enjoined. As a practical matter, a decision by the reorganization court under § 207(b) that a constitutional infirmity requires the Act to be found not fair and equitable would be equivalent, for all practical purposes, to an injunction that might issue as a result of this three-judge court litigation; and a contrary decision would be equivalent to denial of an injunction. It is preferable that the deliberate and collegial judgment of this three-judge court should determine the constitutionality of the RRRA's conveyancing provisions. It is significant that the government has not contended that the § 207(b) hearings operate to render any of the constitutional claims premature.

This is not to say that with respect to many of key constitutional claims the government's contention that there is not an adequate factual record for constitutional adjudication is not sound. Rather, the point is that the government's contentions in this regard should be considered by the Court at this time.

Another aspect of the RRRA's impact that warrants consideration, is the relationship of the availability of the RRA's processes to the pending petitions to terminate rail services and to dismiss the Penn Central's § 77 proceeding. Obviously, the RRRA is an important factor to be weighed by the reorganization court in assessing validity of the petitioners' contentions that operations can no longer be constitutionally required. This consequence in and of itself would seem to justify present consideration by this Court of the constitutional issues deferred by the majority.

Irrespective of the validity of the foregoing observations, I am satisfied that, in the final analysis, many of the constitutional issues concerning the mandatory conveyance features of the Act are necessarily ripe for decision at this time because of their relationship to the issues of interim erosion. While it is not necessary to determine whether or not the contemplated transfers would amount to takings in the constitutional sense, requiring advance assurance of payment in cash or equivalent, I am persuaded that the constitutional validity of uncompensated interim erosion cannot be properly decided except in the light of the constitutionality of the ultimate result which implementation of the Act would produce.

Stated otherwise, the fact that the statute does not provide compensation for interim erosion as such would not necessarily render the statute unconstitutional if there is reasonable present assurance that the end result of the statutory process would be the receipt of consideration for the assets and other

benefits in amounts equaling at least liquidation value plus interim erosion.[2]

## II. *Uniformity*

The Act in its entirety is challenged as violative of the uniformity requirement of Article I, Section 8, Clause 4 of the Constitution. With one minor exception discussed below, I believe that the Act can (and therefore must) be construed in such a way as to render it constitutional. But I reach this result by a somewhat different route than does Judge Aldisert.

Professor Warren tells us:

" . . . any National law which deals with inability to pay debts and which is uniform throughout the country is a law 'on the subject of bankruptcy.'" Charles Warren: Bankruptcy in United States History (Harv.U.Press 1935), at p. 8.

For more than half a century, attempts to achieve national bankruptcy legislation were severely hampered by the widely held belief that the Constitution required that bankruptcy legislation must be uniform in its application to all classes (*ibid*, p. 61). However, the Supreme Court eventually decided that the requirement was geographical. Hanover National Bank v. Moyses, 186 U.S. 181, 190, 22 S.Ct. 857, 46 L.Ed. 1113.

It has been stated that the uniformity requirement

" . . . is wholly satisfied when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country, regardless of the State in which the bankruptcy court sits." Vanston Bondholders Protective Committee v. Green et al., 329 U.S. 156, 172, 67 S. Ct. 237, 244, 91 L.Ed. 162. (Frankfurter, J., concurring).

Taken literally, that statement would seem to vindicate the statute here involved, since this Act unquestionably permits all claims against the affected bankrupt railroads to be treated alike, irrespective of the situs of particular creditors or particular courts. But bankruptcy legislation affects debtors as well as creditors, and it seems doubtful that the quoted language was intended to suggest that different treatment based upon the geographical location of the debtor would be permissible under the uniformity clause.

The fact is, the Supreme Court has never had occasion to consider a statute which was not geographically uniform. The few reported decisions have all dealt with variations in state laws respecting property rights (*e. g.*, exemption), or the application of nationwide standards to particular factual situations determined by courts. *See* Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937).

While Congress' power to classify debtors is not open to question at this late date, *see* In re Baltimore & Ohio R. R. Co., 29 F.Supp. 608 (D.Md.1939), cert. denied 309 U.S. 654, 60 S.Ct. 470, 84 L.Ed. 1003 (1940); In re Chicago, Rock Island & Pacific Ry., 72 F.2d 443, 450 (7th Cir. 1934), aff'd 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), that power may not be exercised on the basis of geography.

■ I cannot accept the notion that only those debtors not affected by the statute can have standing to challenge the lack of geographical uniformity. In my view, every railroad subject to the statute has standing to make that challenge, and so do creditors of such railroads. The Penn Central interests are not complaining that the Act is validly applied to others and not to Penn Central; the contention is that an invalid, non-uniform statute is being applied to Penn Central.

Neither do I accept the government defendants' argument that the statute is in

---

2. Counsel for the government pressed the point that under the conveyance provisions the Special Court could include in its valua-

tion of Penn Central's property an amount sufficient to compensate the estate for unconstitutional interim erosion. Record 98–99.

**534**

fact uniform because all Class I railroads now in reorganization are located in the region defined in the statute. The statute is not limited to Class I railroads, and it is not, apparently, limited to railroads which were in reorganization on the effective date of the Act.[3]

■ But I do find it possible to uphold the statute as an exercise of Congress' powers under the commerce clause. The essential features of an exercise of the bankruptcy power are that it deals with adjustment of the respective rights of embarrassed debtors and their creditors, and that impairment of the obligation of contracts is permissible. Continental Illinois Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935); Hanover National Bank v. Moyses, *supra*. Stated otherwise, recourse to the bankruptcy clause to justify Congressional action is necessary only if that action impairs the obligation of contracts.

For the most part, the statute under discussion adds nothing, in that respect, to the powers already granted to reorganization courts under the geographically uniform and admittedly valid provisions of § 77 of the Bankruptcy Act. To some extent, those powers are transferred to the Special Court, but this is surely permissible under Article III of the Constitution. The ultimate dispositions of the respective rights of debtors and creditors are to be made under § 77. Authority to order conveyances free and clear of liens, and to "cram down" a plan of reorganization, already exists under § 77, and is not newly created or added by the 1973 Act.[4]

■ Therefore, in my view, since the principal provisions of the 1973 Act

which depend upon the bankruptcy power for their validity are merely repetitive of similar provisions in existing, valid, laws, the statute as a whole does not violate Article I, Section 8, Clause 4 of the Constitution.

There is, however, one provision of the Act which is clearly an exercise of Congressional power derived solely from the bankruptcy clause, and which cannot be found in existing, uniform, legislation. I refer to the provisions of § 207(b) which mandate dismissal of the § 77 proceeding if the procedures of the Act are rejected. At first blush, this might seem relatively innocuous: Since the particular debtors have been found to be incapable of reorganizing "on an income basis" under § 77, dismissal of the § 77 proceeding might be thought to follow as a matter of course.

But a § 77 proceeding may properly lead to results other than a "normal" income-based reorganization of a railroad as a railroad. The New Haven Inclusion case, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), stands as a prime example of a type of reorganization designed to produce permanent withdrawal of the debtor from common carrier operations. There, the rail assets were disposed of, with a view toward reorganizing the enterprise as an investment holding company. The plan of reorganization was approved by the ICC, the reorganization court, and the Supreme Court.

■ It thus appears that § 77 can be used to produce a form of liquidation, at least where the plan contemplates that the bulk of the rail properties will continue to be operated as a railroad by someone. The provisions of § 207(b) of the Act seem to preclude that kind of re-

---

3. By implication, it appears that the statute could not affect a railroad unless it was in reorganization on January 2, 1974, or entered reorganization within 180 days thereafter. Whether there are any railroads in the latter category does not appear.

4. As discussed in Part IV, *infra*, the RRRA does sharply alter the procedural, and per-

haps substantive, foundation upon which these existing bankruptcy powers have traditionally been exercised. Although the question is a close one, I have concluded that these departures are not necessarily a sufficient basis for invalidating the entire Act on uniformity grounds.

course to § 77. Since this partial repeal of § 77 of the Bankruptcy Act applies only to debtors in the geographical region specified in the statute, and since that feature of the Act is plainly a law "on the subject of bankruptcy," I am forced to conclude that the Act is, in that one respect, violative of Article I, Section 8, Clause 4 of the Constitution. Indeed, it seems probable that that same portion of § 207(b) is vulnerable on due process and equal protection grounds, and perhaps on the ground of separation of powers as well.

### III. Underlying Principles and Background

In order to evaluate the constitutional permissibility of interim erosion in light of the constitutional adequacy of the end result, it is helpful to review briefly the legal theories underlying the reorganization provisions of the Bankruptcy Act, and their application to the Penn Central proceedings apart from, and in relation to, the RRRA itself.

### A.

Reorganization of financially embarrassed debtors pursuant to a plan that is feasible, fair and equitable is beneficial to both public and private interests. Underlying the reorganization process is the simple economic fact that the intangible values inherent in a going concern will be lost if individual creditors are completely free to exercise their rights to foreclose on the physical assets of the enterprise.

> "One of the purposes of § 77B was to avoid the consequences to debtors and creditors of foreclosures, liquidations, and forced sales with their drastic deflationary effects." Case v. Los Angeles Lumber Products, 308 U.S. 106, 124, 60 S.Ct. 1, 11, 84 L.Ed. 110 (1939) (Douglas, J.) [5]

See also R. F. C. v. Denver & Rio Grande Western R. R. Co., 328 U.S. 495, 508, 66 S.Ct. 1282, 90 L.Ed. 1400 (1945).

If the reduction in values associated with forced sales can be avoided, and going concern values wholly or partially preserve many junior interests which would have been wiped out by liquidation (junior secured, unsecured and equity interests) may participate in the plan. See generally, Blum, The Law and Language of Corporate Reorganization, 17 Univ. of Chicago L.R. 565 (1950). The medium of exchange is, of course, new corporate securities of the surviving entity.

Allocation of the new securities poses both practical and theoretical problems. The theoretical difficulty involves the method of recognizing the respective priorities of the various claimants. Section 77(e)(1) is the pertinent statutory provision:

> "The judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section [77], is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders."

As Mr. Justice Douglas observed, in Case v. Los Angeles Lumber Products, supra:

> "The words 'fair and equitable' . . . are words of art which prior to the advent of § 77B had acquired a fixed meaning through judicial interpretations in the field of equity receivership reorganizations." 308 U.S. at 115, 60 S.Ct. at 7.

The substance of the fair and equitable test is derived from Northern Pacific Ry. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), in which the Supreme Court established what has become known as the absolute priority rule. Simply put, the absolute priority rule re-

---

5. § 77B was a general corporate reorganization statute enacted in 1934, one year after § 77, but superseded in 1938 by Chapter X of the Chandler Act.

quires that "once a hierarchy of interest is established, each class must receive 100% satisfaction before the next lower class may participate at all." Friendly & Tondel, The Relative Treatment of Securities in Railroad Reorganizations under § 77, 7 Law & Contemporary Problems 420, 423 (1940). Yet, claims may be satisfied in whole or in part by securities of a character inferior to those originally owned by the claimant, so long as junior claimants are not permitted to participate unless and until the senior claimants receive under the plan the equitable equivalent to their entire panoply of rights under their original debt instruments. Consolidated Rock Products v. DuBois, 312 U.S. 510, 61 S. Ct. 675, 85 L.Ed. 982 (1941); Ecker v. Western Pacific R. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 (1943); Group of Institutional Investors v. Chicago, Minneapolis, St. Paul & Pacific R. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L. Ed. 959 (1943).

Basic to the application of the absolute priority rule is the valuation of the enterprise and the determination of value of the security underlying purportedly secured claims. Both § 77(e) and the Supreme Court's pronouncements in the *Consolidated Rock Products, Ecker,* and *Institutional Investors* cases require that earning power or income-generating capacity of the debtor be the measure of a railroad's value. Once the earning power has been established, the aggregate capitalization of the new capital structure is derived from the earning power. Although § 77 does not contain an explicit requirement that the reorganization plan be feasible (in the sense that the new capital structure is such that a viable entity will survive the reorganization process), the Interstate Commerce Commission's duty under § 77(d) to formulate a plan that is in the public interest has been read to include this requirement. Group of Institutional Investors v. Chicago, Minneapolis, St. Paul & Pacific R. R. Co., 318 U.S. 523, 544–545, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

Congress has invested the judiciary with powerful tools for the effectuation of § 77 reorganizations. Preservation of the *status quo* can be insured by the prudent exercise of the stay provisions of § 77(j). Trustees' certificates having priority over secured debt may be issued pursuant to § 77(c)(3) to obtain interim working capital. Executory contracts may be rejected by the trustee or in the plan of reorganization § 77(b). Rail and non-rail properties may be sold free and clear of liens under § 77(o) (subject to the limitation imposed in this Circuit by In re Penn Central Transportation Co., 458 F.2d 1030 (3d Cir. 1973)). Under certain circumstances, funds held subject to the liens of mortgage indentures may be used for working capital or additions and betterments to the plant, Central R. R. of New Jersey v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3d Cir. 1970); In re Third Avenue Transit Co., 198 F.2d 703 (2d Cir. 1952). And notwithstanding lack of majority support, an approved plan may be confirmed under the cram-down provision of § 77(e), R. F. C. v. Denver & Rio Grande Western R. R. Co., 328 U. S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946). Moreover, the expertise of the Interstate Commerce Commission is made an integral part of a § 77 reorganization process by the assignment to the Commission of the task of formulating the plan, ascertaining the values of railroad property, and evaluating the public interest aspects of the proposed uses of a § 77 debtor's transportation property.

The reorganization process fosters the public interest as well as the private interests of owners and creditors. The economic inefficiency of dismantling a potentially productive enterprise is avoided, and investor confidence is restored. Moreover, § 77 is designed to promote the public interest in preservation of a sound rail transportation system. Continental Illinois Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 676, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

### B.

The Regional Rail Reorganization Act of 1973 represents the Congressional response to the unfortunate fact that the processes and concepts of § 77 outlined above proved inadequate to deal with the current plight of railroads in the Northeast. Section 77 is adequate only when a railroad's revenues are, or can reasonably be predicted to be, in excess of operating expenses.

Historically, railroad reorganizations have been precipitated by the circumstance that fixed charges were unrealistically high in relation to long-term earning capacity. The solution was to scale down and stretch out the debt structure so that fixed charges could be met from net operating revenues without exhausting those revenues.

Penn Central and most of the other bankrupt northeastern carriers do not generate net operating revenues, but incur large operating deficits. They cannot achieve reorganization on an income basis under § 77.

As a matter of simple maximization of values, if there is no "going concern" value in the usual sense, there is no justification for continuing a reorganization proceeding,[6] unless either or both of the following conditions are established: (1) a reasonable prospect that, because of streamlining, consolidations, and other changes in circumstances, earning power and profitability can be restored; or (2) a reasonable prospect that the public need for preserving the debtor's railroad is such that it will be appropriated for public use, and that the values inherent in its assemblage as an operating railroad will be recognized and paid for. *Cf.* Port Authority Trans. Hudson Corp. v. Hudson Rapid Tubes, 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E. 734, cert. denied 390 U.S. 1002, 88 S.Ct. 1244, 20 L.Ed.2d 103 (1967).

If Penn Central were not a railroad and were being reorganized under Chapter X, presumably a liquidating plan of reorganization would be pursued, 6A Collier ¶ 10.02, at pp. 421–23, or the proceeding would be converted to a straight bankruptcy proceeding or dismissed under § 236 of the Act. But railroad corporations are not eligible for relief under the straight bankruptcy provisions. Section 77(g) does permit dismissal of the case, but the implications of such a dismissal are not clear. Presumably, such a dismissal would be immediately followed by an equity receivership and the relatively cumbersome and unsatisfactory liquidation measures available in such a proceeding.

As discussed in Part II of this Opinion, a plan of reorganization providing for the partial or total liquidation of a § 77 debtor's rail assets might well be accomplished under § 77. The language of § 77(b)(5) provides that:

> "[The plan may provide for] the sale of all or any part of the property of the debtor either subject to or free

---

**6.** The significant advantage of § 77 over the equity receivership is the substitution of the Interstate Commerce Commission's valuation procedures for the foreclosure sale of the equity receivership as the mechanism for determining who has an interest in the debtor's estate. *See* generally S.E.C., Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees, Part VIII (1940). But clearly, the § 77(e) procedures are assumed to result in a valuation in excess of that which would be obtained by the foreclosure sale. As Mr. Justice Reed observed in R.F.C. v. Denver & Rio Grande Western R.R. Co., 328 U.S. 495, 509, 66 S. Ct. 1282, 1290, 90 L.Ed. 1400 (1946) :

"Liquidation in depression periods meant that large portions of debts, as well as stock interests in the properties, would be irretrievably lost to the holders, while reorganization on a capitalization that estimated what normal income would support meant the salvage of sound values. We see no more constitutional impediment to the elimination of claims against railroad debtors by the Interstate Commerce Commission's determination of values, with judicial review as to the sufficiency of the evidence and compliance with statutory standards, than we do to their elimination by an accepted bid in a depression market."

from any lien at not less than a fair upset price."

The New Haven plan can be characterized as a liquidating type of reorganization plan. However, in its October 1973 report to the Penn Central reorganization court (Document No. 6336), the ICC expressed the view that such a liquidation could not be regarded as a plan of reorganization under § 77, apparently on the basis of a perceived difference in the degree of assurance of continued operation of the railroad by someone.

It is against this background, and in light of the accrued and continuing post-reorganization losses summarized in Judge Aldisert's Oinion, that the provisions of the Act are to be considered.

## IV. Analysis of the Pertinent Provisions of the Statute

It is desirable at the outset to attempt to characterize the Act in terms of some familiar legal model or category. To the extent that the statute can thus be labeled, e. g., as a reorganization statute or as an eminent domain statute, the constitutional implications emerge with reasonable clarity. Unfortunately, the Act does not fit comfortably into any familiar category.

From the terminology employed in the statute, and much of the legislative history, it would appear that a reorganization-type statute was intended. But on the basis of its total impact, such a characterization is somewhat misleading. Perhaps the best description of the essential character of the statute appears in § 207(b):

"Each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether or not such railroad shall be reorganized by means of transferring some of its rail properties to the Corporation pursuant to the provisions of this Act."

It bears emphasis that the Act does not affect the reorganization process of § 77 directly. Upon completion of all of the procedures contemplated by the Act, it will still be necessary for the parties to the Penn Central proceeding to complete the process of adjustment of creditors' claims, and of proposing, processing and consummating a plan of reorganization that is fair and equitable in accordance with the requirements of § 77. What the Act does is provide a mechanism for consummating, insofar as the Debtor's rail assets are concerned, what would be in effect a liquidating reorganization plan, if the properties are transferred to Conrail (and perhaps other solvent railroads) pursuant to the Final System Plan. In connection with such a partial liquidation scheme, the § 77 role of the Interstate Commerce Commission is largely eliminated, as is participation and voting by creditors. Essentially, the Act provides a buyer for some or all of the Debtor's rail properties, an expedited mechanism for terminating rail services over the balance of the Debtor's properties, and expedited procedures for achieving the transfer and sale.

Thus, the Act can be viewed as a reorganization statute in the sense that it provides for disposal of some or all of the Debtor's rail properties in a manner analogous to dispositions authorized by § 77(o) of the Bankruptcy Act during the course of a reorganization and outside a reorganization plan, or pursuant to § 77(b)(5) of the Bankruptcy Act as part of a reorganization plan. The obvious difference, however, is that under § 77(o) a sale must be found to be "in the interest of the debtor's estate and of ultimate reorganization" and the price must be adequate, and under § 77(b)(5) the sale price must be at least equal to a fair upset price established by the reorganization court. It is noteworthy that, in the New Haven Inclusion case, supra, the reorganization court viewed the conveyance of the New Haven's properties to Penn Central as having been made pursuant to § 77(b)(5). Although the full price was not to be finally ascertained until after the conveyance, a minimum price had been established before the conveyance, and the parties were all

willing to leave the final price open for further litigation.

The *New Haven Inclusion* case is particularly instructive in another respect: There, a substantial part of the purchase price was to be paid in the form of Penn Central stock. In order to insure that the New Haven interests would receive the actual value of the assets conveyed, Judge Anderson imposed an underwriting provision which in effect required a guarantee that the stock would regain its previous market value of $87.50 per share at some time during a ten-year period following the conveyance.[7] The Supreme Court expressly approved that feature of the transaction, as of the date of the district court's decision, but since Penn Central had entered reorganization shortly before the Supreme Court decided the case, the Court remanded for further proceedings, stating:

> "The fairness and equity that are the essence of a § 77 proceeding forbid our approval of a payment for the transferred New Haven properties that may be worth only a fraction of its purported value. . . ." 399 U.S. at 488–489, 90 S.Ct. at 2108.

The decision of the Supreme Court can be fairly read to mean that, if shares of stock are to constitute part of the consideration for a sale under § 77(b)(5), the issuer must in some manner underwrite the value of the stock.

It is apparent that the approach represented by the Act is quite different from what has heretofore been considered as within the ambit of § 77(*o*) or § 77(b)(5). The transfer transaction is initiated by Congress and is to be implemented through USRA and Conrail. The value of Conrail stock is to be determined after the conveyance, and the railroad must accept the risks of fluctuations in market price (assuming that the stock is marketable at all).

At first blush, there is some similarity between the approach of the Act, and the treatment accorded claimants in the § 77 proceeding under a plan of reorganization. Pursuant to such a plan of reorganization, secured and unsecured creditors, as well as stockholders, may be required to relinquish their property rights in exchange for securities of inferior character. Such exchanges are, of course, subject to the absolute priority rule and the standards of § 77(e) concerning valuation. Claims which cannot be satisfied within the framework of the new capital structure are discharged.

But again, this is only a surface similarity. The Act does not operate at the claimant-debtor level, but involves the debtor and Conrail. The Conrail securities are to be issued to the debtor, not to its creditors. The valuation of the creditors' security and their treatment under the plan would not be contemporaneous, or, perhaps, even related. While an eventual reorganization plan for the railroad might provide for a direct pass-through of Conrail securities to the creditors whose claims were secured by properties taken by Conrail, that would not be a necessary result. Moreover, the voting rights of Conrail stockholders would be so limited that they would have no voice in management of the enterprise, § 301(d), and, apparently, the stock would be ineligible for listing on the major exchanges.[8] Thus, it is clear

---

7. In re New York, New Haven & Hartford R.R. Co., 314 F.Supp. 793, 808 (D.Conn. 1969).

8. In R.F.C. v. Denver & Rio Grande Western R.R. Co., *supra*, the Supreme Court affirmed the district court's confirmation and cram down of a plan on a group of junior secured creditors. In reviewing the dissenter's contention that the original valuation by the Interstate Commerce Commission was too low and that, in any event, subsequent events demonstrated the valuation was too low, the Court stated that "the unlimited dividends that might be earned and paid on the common stock . . . in the 'lush years,'" 328 U.S. at 518, 66 S.Ct. at 1295, and the large amount of cash on hand were "part of the compensation to senior claimants for their loss of position," 328 U.S. 522, 66 S.Ct. 1297. Moreover, the bondholders obtained some control of the corporation by receiving common stock. While the earnings at the time of the challenge to the plan

that the Act does not fit comfortably within any existing procedure or mechanism under the Bankruptcy Act.

Finally, it is of course clear that the approach of the Act does not fit an eminent domain model. It does not provide for payment in cash, payment is not assured in advance of the conveyance, and there is a limit upon the amount of the consideration.

There are, however, at least partial resemblances to a condemnation approach. The conveyances are not voluntary, on the part of either the purchaser or the seller. Conrail, although purportedly a private corporation, has no choice in the matter. The only element of choice, insofar as the railroad is concerned, is the limited choice afforded in connection with the § 207(b) findings, and these are choices of the courts, not of the railroad or its creditors. From the standpoint of the seller-railroad, there is no assurance that the price will ever actually be realized. If the value of Conrail's stock, plus whatever portion of the $500 million in USRA bonds are included in the consideration mix, is less than the "constitutional minimum" value to which the railroad is entitled, the Special Court can enter a deficiency judgment against Conrail. But it seems rather obvious that if the value of Conrail's stock is inadequate, a judgment against that same equity would add nothing, and would be essentially circuitous.

From the standpoint of Conrail, on the other hand, the fact that the price may be fixed at a level greater than the value produced by capitalizing the projected earnings of the new venture[9] is a significant departure from the normal concept of a private sale. For a private purchaser would not ordinarily be expected to pay more for a business enterprise than its capitalized earnings.

To summarize, the RRRA represents an amalgam of sale, reorganization, and eminent domain concepts. Implementation of the Final System Plan would produce transactions akin to sales under § 77(o) or § 77(b)(5) of the Bankruptcy Act, but without the safeguards of participation by the parties or advance judicial scrutiny; sales in which the price would be paid in a form somewhat like that encountered in a plan of reorganization. The transactions would somewhat resemble a reorganization in which the "cram down" decision is made by Congress, or at least virtually compelled by Congress, in advance of formulation of the plan. And the plain purpose of the entire arrangement would be to insure the continued availability of these rail properties for use in meeting the public need for continued rail service, without regard to the wishes of the present owners of the properties.

The novelty of the statutory approach does not, of course, establish its unconstitutionality. In dealing with problems of this importance and complexity, it is understandable that Congress should attempt to apply whatever legal concepts might prove useful. But merely because it can be constitutionally permissible under some circumstances to compel creditors in a reorganization plan to be satisfied with stock in the new enterprise, it does not follow that that result is always permissible. Presumably, the Fifth Amendment is equally applicable to bankrupts and non-bankrupts. Thus, if the compulsory character and public purpose of the Act compel the conclusion that the Act constitutes an exercise of the eminent domain power, albeit a slightly indirect one, the use of stock as the compensation medium is extremely suspect. *See,* Nicholas, Eminent Domain ¶ 8.2 (3d rev. ed. 1970) and cases cited therein. Similarly, at least until now, a decision that a stock distribution

---

were substantially in excess of that envisioned by the Interstate Commerce Commission, the Court approved the capital structure based on the earning power, in part, on the theory that the loss of the senior claimants' secured po-

sition justified receipt of stock which had the possibility of paying substantial dividends.

9. *See* note 6, *supra.*

was fair and equitable has always required *contemporaneous* comparisons between the value of the creditors' and stockholders' claims and the value of the stock, a weighing of entrepreneurial risks against the prospects for growth. And merely because it is constitutionally permissible for a reorganization court to authorize sales of assets free and clear of liens, it does not follow that such sales may be approved without knowledge of the purchase price, and without a simultaneous transfer of existing liens to proceeds having value equivalent to the assets conveyed. And, of course, the magnitude of the public interest in continued rail service cannot justify treating these rail properties as if they were already public property.

It is apparent that the determination by the Special Court as to what constitutes the "constitutional minimum" price for the transferred properties is crucial to the implementation of the statute. That issue, as such, is not before this Court and I intimate no view on the merits. But it is important to note that, no matter how that issue may ultimately be resolved by the Special Court, the present, immediate, constitutional obstacle would remain. There is no assurance that the price fixed by the Special Court can be paid, under the statutory scheme.

Under any view of the Act, there is at least a distinct possibility that application of the deficiency judgment mechanism will be required; and, as set forth above, that is an obviously inadequate remedy. It must be assumed that USRA will strive diligently to comply with the Congressional directive to design both "a financially self-sustaining rail service system" and a "rail service system adequate to meet the rail transportation needs and service requirements of the region." At present, no one knows whether these somewhat inconsistent goals can be achieved. Congress itself has recognized the uncertainty, by retaining the right to review the plan before it becomes effective. And of course, even if the Final Plan is designed to show profitability on the basis of *pro forma* projections, there can be no assurance that actual results will live up to the forecasts.

The point is, not that these uncertainties can or should be eliminated, but that all risks—of the possibility of designing a profitable system, of ultimate profitability, and of interim losses while the hypotheses are explored—are imposed upon the debtors and their creditors, who are to be irretrievably committed to the project in advance, no matter how it works out.

As discussed in Part I of this Opinion, I agree with the majority that we need not reach all of the constitutional implications of the transfer provisions of the RRRA. Specifically, we need not now determine whether or not those transfer provisions amount to an exercise of the power of eminent domain. But it is impossible to avoid the conclusion that, before the burden of further interim erosion can constitutionally be imposed upon the railroad and its creditors, there must be greater assurance of a constitutionally acceptable end result than is provided by this statute.

### V. *The Tucker Act Remedy*

For the reasons so well stated in the majority Opinion, I agree that Congress did not intend to provide for any compensation to the railroads or their creditors for interim erosion other than that specified in the Act. Whether this would necessarily preclude a later resort to the Court of Claims on a constitutional theory I deem it unnecessary to decide. I note, however, that the argument of the government defendants in support of such a potential remedy seems to amount to an assertion that governmental immunity is itself constitutionally suspect.

For present purposes, it suffices to state that the availability of a Tucker Act remedy is not now sufficiently assured to justify denial of relief in the present litigation. Moreover, the adequacy of any such putative remedy, if it

exists, seems highly questionable. I find it difficult to characterize as due process of law the notion that further interim erosion can be justified because, if the lengthy and complex procedures of the Act do not produce a constitutionally permissible result, the parties may then start over again in the Court of Claims. The rights of the secured creditors of the New Haven, for example, have already been held in suspension for more than ten years.

I concur in the result reached by the majority. I am authorized to state that Judge Bechtle joins in Part II of the foregoing Opinion.